# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Exhibit 1

In the Matter of:

## Moises Carranza-Reyes v. Park County, et al.

05-cv-377-WDM-BNB

## DEPOSITION OF:

## MEREDITH POPPISH

DATE TAKEN:    August 22, 2006

PAGES:    1-105

REPORTED BY:    Stacy Armstrong, RMR

## H+G

Hunter + Geist, Inc.    **(303) 832-5966**

- www.huntergeist.com
- depo@huntergeist.com

1900 Grant Street  Suite 300
Denver, Colorado 80203
Fax: (303) 832-9525
Toll Free: 1-800-525-8490

**33**

1 hypertension.
2      Hypertension is a well documented and well
3 known side effect of severe chronic pain. And I felt
4 that Moises describing the pain that he was in, and
5 particularly since the systolic blood pressure wasn't
6 particularly elevated, it was his diastolic, I felt that
7 it was likely secondary to pain, but I needed to recheck
8 him several times in order to actually diagnose him with
9 the hypertension as being a hypertension secondary to
10 some sort of morbidity cardiovascularly or whether it
11 was only secondary to pain, and if you could remove the
12 pain, then you could remove the hypertension. He was in
13 a significant amount of pain that first day that he came
14 in.
15      Q. So on that date you couldn't rule out other
16 causes of the hypertension?
17      A. I could not.
18      Q. Here you also write "at next visit will have
19 him fill out a PRIME MD." What is that?
20      A. A PRIME MD is the tool that we use at the
21 clinic to measure -- it's a depression scale that will
22 quantify someone's emotions of depression, quantify
23 whether or not they're suicidal, if they're able to
24 perform their activities of daily living.
25      Q. And then you write "will assess further for

**34**

1 PTSD/depression." What made you believe that it was
2 necessary to assess further for those conditions?
3      A. The impotence in particular because he felt
4 that the impotence was related to his experience. And
5 impotence is also a known side effect of -- side effect
6 isn't correct, though -- an associated result or
7 morbidity of posttraumatic stress disorder. And also
8 just his -- just his frustration that he wanted to have
9 a normal life, you know. And that's something with any
10 patient; when someone comes in and they're facing
11 something really huge, we try to be really aggressive
12 about depression at the clinic, and we try to offer that
13 resource to our patients. So it was something that I
14 wanted to evaluate further. And if I had had an hour to
15 see him that day, I would have done it that day, but
16 since, you know, the time limit of the visit, he has to
17 come back for that.
18      Q. Did he self-report any depression symptoms?
19      A. Really sad, and wanted really hard to be
20 hopeful. From the very first visit he came across to me
21 as a sort of motivated, hopeful kind of guy, and he felt
22 really walled in by what he couldn't do for his health,
23 really walled in by what he wasn't able to do to
24 recover, and he wanted to have a normal life. He really
25 wanted a relationship. He really wanted to have a

**35**

1 relationship, and he really felt that he couldn't do
2 that in the state that he was in. He wanted to move on,
3 but he didn't know how, I guess, would be the best way
4 for me to say that.
5      Q. Did he report any like difficulty sleeping,
6 changes in appetite?
7      A. He reported difficulty in sleeping because of
8 the pain. So, you know, it would be really hard for me
9 to distinguish that. But I would say that his
10 difficulty in sleeping was because of the pain. It was
11 more just a feeling of trying to be hopeful and not sure
12 if there was really anything to hope for, and some
13 sadness because of his situation, really wanting his
14 life back.
15      Q. Do you know whether he had been medically
16 treated before he came to your clinic and after the
17 amputation?
18      A. Treated for like stuff related to the
19 amputation?
20      Q. I guess do you know whether he had gone to any
21 provider for these problems of leg pain before he came
22 to you?
23      A. To my knowledge, no. His treatment, as he
24 told me, ended at Denver Health after he was discharged.
25 He does see a physician for his prosthesis, but I can't

**36**

1 recall his name. But, other than that, no, he hadn't
2 been able to get any other treatment.
3      We initially took Moises on as a patient
4 because his family member, his brother, I believe it
5 was, had been a patient at the clinic for quite some
6 time. And my medical assistant was putting in someone
7 from his family, and I don't know who that was. And
8 they asked about Moises and his situation. At the time
9 the clinic was not taking patients -- not taking new
10 patients, but as providers we have the ability to make
11 the decision of whether to take someone. And my medical
12 assistant had been sort of touched by the story and, you
13 know, felt really awful, and they had told her, you
14 know, that he had no access to treatment. So that was
15 why I said, oh, okay, you can send this guy in. So
16 based on that, I would say no, that he hadn't had any
17 treatment between me and Denver Health.
18      Q. Did he complain of the pain occurring since
19 2003 when he had the amputation?
20      A. Yes. Like he had never been able to get a
21 hold on it. After the surgery he felt like the pain was
22 going to get better, his condition was going to improve,
23 and he felt that he couldn't make that happen, that he
24 didn't have access to what he needed.
25      Q. Can you tell me what the line says, also will

**9 (Pages 33 to 36)**

**57**

1 clonidine and he was still taking Tylenol, he has
2 consistently described his pain to me to be unbearable.
3 And in Spanish it's very strong, very strong, you know.
4 Hard to translate.
5     Q.  So what was the outcome after the pain
6 consult?  Was there any change in his treatment plan
7 other than trying the clonidine?
8     A.  We were going to try the clonidine, and then
9 we really wanted to try this Lidoderm patch on him,
10 which is like a lidocaine patch, and it works also
11 really well for neuropathic pain, and he could put it
12 right on his amputation site.  But it's very, very
13 expensive.  And so I talked to him about the drug
14 reactions there.  I gave him seven of them because you
15 can get them a little bit cheaper that way.  And you can
16 cut the Lidoderm patch.  So it's not like he had to use
17 it all at once.  So we were thinking, hey, if he doesn't
18 need that much of it, this may be cost-effective.  And I
19 had also talked to Dr. Wu about this.  And then we
20 decided that if he liked them that we would try more.
21     When he went to go buy the Lidoderm patches --
22 and this, I believe, took place in a conversation in the
23 waiting room when I saw him out there -- the Lidoderm
24 patches, he ended up not being able to afford them.  And
25 so after that I spoke with Dr. Wu about possibly using a

**58**

1 lidocaine gel and putting it on a bandage and placing
2 this bandage on Moises's amputation site.  But I'm not
3 sure -- especially since this is the last note in here,
4 I'm not sure if he did that or not.  I do know that at
5 this point he is not taking anything for pain.  And that
6 was pretty much where we left it.
7     Dr. Wu really felt that he needed specialist
8 care and that because he didn't -- You know, the things
9 that we try with patients with these types of things are
10 like methadone and Vicodin extra strength, and all of
11 these combinations of medications.  And given that he
12 didn't want to take those medications, what we could do
13 in a family practice clinic was really limited.
14     Q.  Do you know how he pays for his services at
15 the clinic?
16     A.  We have a sliding scale fee set up at the
17 clinic.  So based on their appointment with a person
18 that we call the financial screener, we determine sort
19 of what group they belong in and what they can afford to
20 pay.  My understanding would be that someone like Moises
21 would only pay a small copay when he got to the clinic
22 at the front desk, and then he's responsible for paying
23 for his medications.
24     Q.  Are you involved in that process at all, the
25 payment process?

**59**

1     A.  No, not at all.
2     Q.  Do you know whether he paid or didn't pay?
3     A.  I have no idea, unfortunately.  Sorry.
4     Q.  What is clonidine, by the way?
5     A.  Clonidine is a drug that we use for a lot of
6 things.  Its on-label use is for hypertension, but we
7 don't use it very much for that anymore.  We do use
8 it -- It can make you real sleepy, and so we don't use
9 it very much.  But Dr. Wu likes to use it in certain
10 instances for chronic pain.  But, again, I didn't
11 prescribe that.  I don't ever take anything quite that
12 far for chronic pain, so that's more something that
13 Dr. Wu does.
14     Q.  And, do you know, did Moises purchase the
15 clonidine or did you guys provide samples?
16     A.  No, we don't have samples.  So my
17 understanding would be that he purchased the clonidine.
18 Clonidine, to my understanding, is not a particularly
19 expensive drug, but I don't know the exact cost.
20     Q.  Do you know whether Moises has been working at
21 all?
22     A.  I don't.  I don't think so, but I don't know
23 for sure.
24     Q.  At the bottom of your note it says "Discussed
25 the nature of chronic neuropathic pain, control

**60**

1 measures."  What control measures?
2     A.  I really wanted Moises to take narcotics.  I
3 wanted to try some benzodiazepines, I wanted to try some
4 different modalities of pain control because his pain
5 was just -- it was just awful.  It was awful to listen
6 to someone tell me about being in that kind of pain, no
7 matter who it was.
8     So I talked to him about the idea that, you
9 know, Dr. Wu and I felt that with this current situation
10 with the unavailability of surgery, that medication was
11 the road that we wanted to go down.  And we felt that it
12 was the only thing that we could do at the clinic.
13     And so I wanted to sit down with Moises and
14 talk to him about the possibility that when he couldn't
15 obtain specialty care, he couldn't get physical therapy
16 or rehabilitation or corrective surgeries, that maybe we
17 were going to need to try some of these medications, and
18 we could tweak it and see if we could get a certain
19 level of control without making him too tired.  And I
20 wanted him to think about trying that stuff and think
21 about the idea that maybe his future wouldn't be exactly
22 the same as what he had pictured it as being before he
23 got his amputation, and that maybe we would have to work
24 with that.  So that's kind of what I was saying there.
25     Q.  What is your professional expectation about

**15 (Pages 57 to 60)**

**Carranza-Reyes v. Park County**     **MEREDITH POPPISH**     **8/22/2006**

---

**61**

1   what the narcotic drugs could do for him pain
2   management-wise?
3     A.   Narcotics are indicated for the treatment of
4   chronic severe pain, particularly neuropathic pain,
5   which is particularly documented as being difficult to
6   control. And while I did not feel that it was going to
7   make his pain go away, I felt that some combination of
8   benzodiazepines, likes Valium, and a low-dose narcotic,
9   even if he just took it before bed, might give him some
10   relief. And, remember, at this point he's got no
11   relief.
12     So I'm really looking at sort of, you know,
13   what could we do to at least make it a little bit
14   better? Given the fact that we're given these limited
15   resources in this family practice clinic, what could we
16   possibly do? And I felt that pain-wise we might be able
17   to make it better. But quality of life-wise maybe it
18   would make it worse because he didn't want to be sleepy,
19   he didn't want to be dizzy.
20     Q.   Are you familiar with Colorado's new
21   immigration law they just passed?
22     A.   I am.
23     Q.   Does that impact the ability of Moises to get
24   treatment there at your clinic?
25     A.   No, it does not.

**62**

1     Q.   Okay. Also in this note it says you discussed
2   options for consultation. Do you know what you
3   discussed?
4     A.   The providers that in a perfect world I would
5   really love to send him to and providers that if he ever
6   found that he had -- I mean, this is my stock speech for
7   all of my patients without insurance. If you can, if
8   it's possible in the life that you live, set aside a
9   small amount of money every week and maybe I could find
10   someone who might be willing to donate you a little bit
11   of time in addition to the time that you could pay for,
12   and maybe we might be able to get at least one consult.
13     It's my professional obligation to always tell
14   my patients, hey, you know, I'm not a chronic pain
15   specialist, I'm not an orthopedic surgeon; I'm a family
16   nurse practitioner in a generalist family clinic. This
17   is what we can do for you. And if you had insurance,
18   this is what I would do for you and this is what you
19   really need. So, you know, basically we're doing the
20   very best we can with what we have, and there's more out
21   there that you just don't have access to.
22     Q.   Do you recall speaking with someone named Chan
23   Morgan or Charlene Morgan?
24     A.   I don't.
25     Q.   Did you speak with anybody from Helen

**63**

1   Woodard's office about Moises Carranza-Reyes?
2     A.   I don't think so. I don't know who Helen
3   Woodard is.
4     Q.   She's a life care planning expert. Do you
5   recall any conversations with life care persons about
6   his future needs?
7     A.   I don't. That doesn't mean -- I'm so sorry.
8   It doesn't necessarily mean that there wasn't a phone
9   conversation that may have happened at some point, but I
10   have no recollection of that at all.
11     Q.   Well, I'll represent to you that Helen Woodard
12   has in her notes that she had a conversation with you on
13   December 14, 2005.
14     A.   Okay.
15     Q.   Which appears to be about two days after you
16   first saw Moises.
17     A.   Yeah.
18     Q.   Does that refresh your memory at all?
19     A.   It doesn't. I'm so sorry. It's not like I --
20   I haven't really been thinking about this too much, so I
21   don't recall.
22     Q.   She states that you told her that
23   Mr. Carranza-Reyes had high blood pressure related to
24   his pain. It sounds from your testimony today that that
25   isn't accurate.

**64**

1     A.   That would be in line with something I would
2   have said. There may have been other things that I said
3   about it, but, yeah, I would say that that would be
4   perfectly reasonable.
5     Q.   Do you believe he's in need of extensive care
6   that he wasn't getting -- that he's not getting due to
7   his finances?
8     A.   Unfortunately, yeah, I do.
9     Q.   And what extensive care is that?
10     A.   I feel, again, that he needs a consult with an
11   orthopedic specialist, he needs extended physical
12   therapy and rehabilitation services, he needs to meet
13   with a chronic pain specialist and possibly a
14   neurologist.
15     Q.   How about a pulmonologist?
16     A.   Well, given that he had part of his lung taken
17   out, I suppose that would be okay, but I don't recall
18   saying that at all. I don't recall the conversation at
19   all.
20     Q.   Yeah, I understand. Is a consult with a
21   pulmonologist something you believe he needs?
22     A.   Not based on what I've talked with him about.
23   But, again, given that part of his lung was removed, in
24   a perfect world, if someone felt that it was warranted,
25   certainly I would refer him there.

**16 (Pages 61 to 64)**



1435 Reed Street
Lakewood, CO 80214
(303) 238-3700 Voice/TDD
(303) 237-3705 Fax

**Helen M. Woodard, M.A.**
Rehabilitation Counselor

EXHIBIT :2

**Re Entry** Rehabilitation Services, Inc.

April 28, 2006

RE:   **Moises Carranza-Reyes**
      **Preliminary Report**

Moises Carranza Reyes was referred for a rehabilitation assessment and preparation of a life care plan. He was interviewed and participated in vocational testing in our office. His medical records were reviewed and potential care providers were contacted. regarding current medical needs and future care recommendations. Moises nurse practitioner, Meredith Poppis, provided information by telephone.   Labor market information was also used in this assessment.

**HISTORY**

(Moises history was obtained through the use of an interpreter, Dina Valenzuela.)

Moises Carranza Reyes was born in Mexico City, Mexico on February 8, 1976.  He attended some high school but quit so he could work full time in a tailoring shop. At the shop, Moises cut out clothing and patterns and operated industrial sewing machines. At age 18, Moises began working for the Public Security Sector as a police officer. He made arrests of people for drugs and traffic violations and provided security for politicians and buildings. From 1998 to 1999, Moises worked in a shoe store called Perugia Zapeteria, and also drove a taxi (using his own car) from 1998 to 2001.  From 2001 to 2003, Moises served in the Mexican Army. In 2003, he worked in a meat shop in Mexico City called La Paloma. Moises came to the United States to research the process of citizenship (as his father was a U.S. citizen) and to work. He was traveling to Chicago when he was arrested in Rifle, Colorado.

According to Moises, he was taken to a detention center, stripped and told he would be deported in two to three days. He was then transported to a different jail with several other Mexican male immigrants, and given dirty clothing and bedding. He indicated that there were many people there who were sick, and because of the overcrowding, he had to sleep on the floor between beds. Moises became ill and requested to see a doctor, but was denied.. He was

Page Two
Moises Carranza-Reyes
April 28, 2006

told by a nurse that he had altitude sickness and was given two
pills. Moises got sicker with body aches and fever and was told by
the nurse to drink water. While Moises was sick, an interpreter
complained that his clothes smelled bad, and so they were taken
from him and he remained nude. Moises got sicker that night and
requested to see the nurse again, but was told she was too busy.
Moises was throwing up and a sheriff took him to the infirmary and
gave him some unidentified medications. In the morning, Moises
tried to stand but passed out. When he awoke, he was instructed to
lay on a mattress on the floor with a chair and trash can. Moises
continued vomiting, and realized there was blood in his urine.
Later that day, Moises was cleaned up and taken to the hospital. He
was transferred to a different hospital where a police officer
chained him to the bed. Moises lost consciousness and has no
recollection of further events, until he woke up and his brother
informed him that his leg had been amputated. Moises spent several
months in the hospital and afterwards went to live with a friend
and then with his brother.

Moises has not worked since his leg was amputated.

MEDICAL RECORDS REVIEW

On March 8, 2003, Dr. Frederick Albrecht, of Denver Health Medical
Center, stated that Moises had been arrested three days prior.
During incarceration, Moises complained of increasing shortness of
breath, fevers, chills, nausea and vomiting. Upon examination in
the Summit County emergency room,  Moises was noted to be in
respiratory distress and was hypotensive. He was transferred to
Denver Health and was in extreme respiratory distress and was still
hypotensive. He was intubated and aggressively hydrated. Moises had
acute respiratory distress syndrome, necrotic right lower lobe,
troponin leak, ileus, acute renal failure, left foot gangrene,
sepsis and anemia. He was resuscitated, intubated and catheterized.

An interim summary for the dates of April 1, 2003 through April 30,
2003, by Dr. Laura Sarnat and Dr. Richard Albert, stated Moises was
treated for multilevel group A beta hemolytic streptococcus
pneumonia with subsequent right lower lobe necrosis with cavity
formation and sepsis, left upper lobe pneumonia, acute respiratory
distress syndrome, acute renal failure, left lower extremity
myonecrosis, anemia, Troponin leak, pulseless electrical activity,
transaminitis, coagulotherapy, deconditioning and possible adrenal
insufficiency. Moises had a tracheostomy on March 8, 2003 and a
left below the knee amputation on April 23, 2003, with subsequent
drainage and closure procedures.

Page Three
Moises Carranza-Reyes
April 28, 2006

A discharge summary, dated May 11, 2003, by Dr. Lauren Sarnat and Dr. Kelly O'Brien-Falls, stated that Moises had right lower lobe cavitary pneumonia with group A hemolytic Streptococcus with near complete obliteration of the cavity, left upper lobe pneumonia, a tracheostomy which was subsequently removed, a left lower below the knee amputation due to myonecrosis, right lower extremity necrosis, trachycardia, acute renal failure (resolved), and deconditioning. He was discharged on May 11, 2003.

An incomplete record from Denver Health, by Dr. Jeffrey Fine, states that Moises was admitted on May 16, 2003 for acute rehabilitation, and treated for left lower extremity myonecrosis, small areas of myonecrosis in the gastrocnemius muscle, low back pain, anemia, bacterimai, fungemia, leukopena, hypnatremia, left knee contracture, right peroneal neuropathy, right toe ischemia, malnutrition, phantom limb pain and nausea and vomiting. (Record incomplete).

On June 3, 2003, Dr. Jaqueline Krumrey performed surgery for irrigation and debridement of Moises infected stump. Dr. Thomas Morre performed the same procedure on June 6, 2003. Moises was treated by the inpatient rehabilitation team, and discharged on June 26, 2003.

On December 12, 2005, Ms. Meredith Poppish, nurse practitioner at Clinica Campesina, reported that Moises had severe leg pain that was worse at night. Moises also reported impotence and nocturia since his amputation. Moises was prescribed medications and referred for physical therapy. An assessment for post traumatic stress disorder was discussed and follow up instructions were given.

Meredith Poppish, family nurse practitioner (acting as Moises primary care provider) was interviewed via phone on December 14, 2005. She stated that Moises had high blood pressure related to pain from his amputated leg. She prescribed medication for pain and Moises needed to follow up with her regarding his high blood pressure. Moises was in need of extensive care that he was not getting due to finances. Ms. Poppish recommended consultation and follow up with a pain management physician for Moises' neuropathic pain. He will require pain management modalities on an ongoing basis. Ms. Poppish recommended consult and follow up with an orthopedic specialist or rehabilitation medicine physician two to three times per year; consult with a pulmonologist with an initial set of visits, followed by annual evaluations; physical therapy to

Page Four
**Moises Carranza-Reyes**
April 28, 2006

take place once to twice per week, duration to be determined; and psychological evaluation and psychotherapy to address possible post-traumatic stress syndrome and subsequent sexual dysfunction; follow up by the prosthetist for adjustments and replacement prosthetics; and adaptive equipment to include a power chair, a cane, home modification features such as grab bars and shower chair.

On January 10, 2006, MS. Poppish, indicated that Moises experienced fatigue while taking his medication. Ms. Poppish recommended a pain consultation with Dr. Wu. Possible post traumatic stress disorder was discussed and Moises was referred for counseling.

Ms. Poppish was interviewed a second time on April 17, 2006 and stated that Moises is seen in the clinic weekly for primary care, pain management and counseling. Moises needs to be evaluated by a pain management specialist, a physiatrist, an orthopedist, a pulmonologist, and a psychologist but he is unable to do so at the time for financial reasons. Once Moises obtains care by these providers, he will need to be seen for primary care two to three times per year for issues related to his amputation. Ms. Poppish stated that Moises is still in a significant amount of pain. He needs to see a pain management specialist. He requires additional pain management techniques, including prescription medications. Moises is not using pain medications because he does not tolerate being cognitively impaired or fatigued. Moises is currently using Tylenol and Lidocaine gel daily.

CURRENT STATUS

Moises experiences daily pain involving both lower extremities. He is severe at times and exacerbated by the cold weather. He experiences phantom pain in his amputated limb. Moises' pain interferes with his sleep and daily functions. His prosthetic is painful and he gets sores and bleeding and has difficulty standing and walking for long distances. Since his illness in the jail, Moises has ongoing problems with shortness of breath and fatigue; and he becomes sick easily. He is being followed for high blood pressure as well, which Ms. Poppish noted was related to his pain. Moises has problems with breathing and endurance.

Moises currently holds a permit to reside in the United States, but not to obtain employment. He is working to establish citizenship and hopes to stay in the United States to have access to appropriate medical care.

Page Five
Moises Carranza-Reyes
April 28, 2006


## VOCATIONAL TESTING

The following are tests Moises was given and the scores he
attained.  The achievement test results are reported as grade
levels, and the aptitude testing is reported as percentile levels,
where the norm group used for comparison is given.  The score is
then read as a ranking out of 100, where Moises' percentile rank
can be read, "scored higher than 'X' out of 100" in this norm group
with "1" being the lowest rank and "99" being the highest rank.

### Achievement Testing

The purpose of the Peabody Individual Achievement Test is to
provide a measure of achievement in the areas of mathematics,
reading, spelling, and general information.  This is an
individually administered un-timed test.

    Mathematics                             4.9 grade level

### Aptitude Testing

The Bennett Mechanical Comprehension Test measures the ability to
perceive and understand the relationship of physical forces and
mechanical elements in practical situations.

    <u>Vocational Rehabilitation Client - Various Occupations</u>
    Injured Workers and Employees
        Percentile Rank                        30

Flanagan Industrial Test - Patterns is a test of an individual's
ability to copy a given pattern accurately.

    Twelfth Grade Students
        Percentile Rank                        62

The PTI Oral Directions Test assesses an individual's ability to
follow instructions presented orally.

    Machine Operators and Feeders at a Southern
    Bearings Manufacturer
        Percentile Rank                        90

Page Six
Moises Carranza-Reyes
April 28, 2006


The Revised Minnesota Paper Form Board Test measures the capacity
to visualize how two-dimensional objects would look if they were
fitted together.

<u>Vocational Rehabilitation Clients - Various Occupations</u>
A Western Center
    Percentile Rank                         65

The SRA Nonverbal Form measures general abstract reasoning ability.
It requires the individual taking the test to decide which one
picture in a group of five pictures does not belong.  No reading is
required.

    Industrial Norms
        Percentile Rank                      66

**Dexterity**

The Bennett Hand-Tool Dexterity Test assesses proficiency in using
common hand tools, including a screwdriver, wrenches, and an
adjustable wrench.

    Employees and Applicants in a Manufacturing Company
        Percentile Rank            97

The Crawford Small Parts Dexterity Test is a performance test
designed to measure fine eye-hand coordination and consists of two
parts.   Tweezers are used to place pins/collars in the first
section of the test, and a small screwdriver is used to place small
headless screws in the second section.

    MALE NORM GROUP
    Unselected Applicants
        Percentile Ranks
            Pins/Collars            84
            Screws                  53

The Minnesota Rate of Manipulation is a test of manual dexterity.
The test involves doing a variety of different movements using one
hand or both hands to manipulate small round objects.

    The Turning Test
        Percentile Rank                     53
    Two Hand Turning and Placing Test
        Percentile Rank                     58

Page Seven
Moises Carranza-Reyes
April 28, 2006

     Placing Test
          Percentile Rank (Right)                          91
          Percentile Rank (Left)                           52

The Purdue Pegboard measures fine finger dexterity.  Small pegs,
brads and collars are placed in the pegboard.

     General Industrial
          Percentile Ranks
               Right                                        60
               Left                                         50
               Both                                         31
               Total                                        50
               Assembly                                     80

**NEEDS ASSESSMENT**

Moises has received very minimal follow up care for his amputation
and chronic pain and has not seen a pulmonologist since leaving
Denver Health Center.   He has services through the Clinica
Campesina and nurse practitioner Meredith Poppish, who has made
recommendations for further care.  The life care plan reflects
recommendations made per Ms. Poppish and using our experience with
patients who have lower extremity amputations and neuropathic pain.
As Moises is seen by specialists, further specific recommendations
are expected, and will be reflected in a supplemental life care
plan.

If you have questions, please call.

Respectfully submitted,

Helen M. Woodard, M.A.                  Charlene Morgan B.S.
Rehabilitation Counselor                Rehabilitation Counselor

Original: Bill Trine, Attorney

CIRCUIT MEDIATION OFFICE

# UNITED STATES COURT OF APPEALS
## FOR THE TENTH CIRCUIT

BYRON WHITE UNITED STATES COURTHOUSE
1823 STOUT STREET
DENVER, COLORADO 80257

Exhibit 3

**DAVID W. AEMMER**
CHIEF CIRCUIT MEDIATOR

TELEPHONE  303 844-6017
FACSIMILE   303 844-6437

**LANCE OLWELL**
**KYLE ANN SCHULTZ**
CIRCUIT MEDIATORS

October 15, 2007

Joseph J. Archuleta, Esq.
Law Office of Joseph Archuleta
1724 Ogden Street
Denver, CO 80218

Josh A. Marks, Esq.
Berg Hill Greenleaf & Ruscitti, LLP
1712 Pearl Street
Boulder, CO 80302

Lloyd C. Kordick, Esq.
Lloyd C. Kordick & Associates
805 South Cascade Avenue
Colorado Springs, CO 80903

Andrew D. Ringel, Esq.
Hall & Evans, LLC
1125 17th Street, Suite 600
Denver, CO 80202-5817

William A. Trine, Esq.
Trine & Metcalf, PC
1435 Arapahoe Avenue
Boulder, CO 80302

RE:  Nos. 07-1380 and 07-1381 - Moises Carranza-Reyes v. The Park County Board
    of County Commissioners, et al.

## NOTICE OF IN-PERSON MEDIATION CONFERENCE
## AND BRIEFING EXTENSION

Dear Counsel:

This will confirm that an in-person mediation conference has been scheduled in these appeals. It will be conducted on **Friday, November 16, 2007** beginning at **10:00 a.m.** Please report to the front reception desk of the Clerk's Office, Byron White United States Courthouse, 1823 Stout Street, Denver, Colorado.

The purpose of this conference is to consider how we might settle these appeals; therefore counsel and clients or client representatives are required to attend.

Pursuant to Rule 33.1, Rules of the Tenth Circuit, the deadline for filing the appellants' brief is extended 30 days.  The appellants' brief and appendix must be filed by **December 7, 2007.**

Sincerely,

DAVID W. AEMMER

*Rose Giacinti*

by: Rose Giacinti

DWA:rg

Exhibit 4

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO
## JUDGE WALKER D. MILLER

Civil Action No. 05-cv-377-WDM-BNB

MOISES CARRANZA REYES,

      Plaintiff,

v.

THE PARK COUNTY BOARD OF COUNTY COMMISSIONERS;
FRED WEGENER, individually and in his official capacity as Sheriff of Park County,
Colorado;
MONTE GORE, individually and in his official capacity as Captain of Park County
Sheriff's Department; and
VICKIE PAULSEN, individually and in her official capacity as Registered Nurse for Park
County, Colorado,

      Defendants.

---

## ORDER ON MOTIONS FOR SUMMARY JUDGMENT

---

Miller, J.

      This case is before me on the Motion for Summary Judgment from Defendants Park

County Board of County Commissioners, Fred Wegener and Monte Gore (doc no 117), the

Supplemental Motion for Summary Judgment (doc no 195) filed by the same defendants,

and Defendant Vicki Paulsen's Motion for Summary Judgment (doc no 121).  Plaintiff

opposes the motions. I have reviewed the parties' written arguments and the evidence

submitted with their briefs. For the reasons that follow, Defendant Paulsen's Motion for

Summary Judgment is denied and the Motion for Summary Judgment from Defendants

Park County Board of County Commissioners, Fred Wegener and Monte Gore is granted

in part and denied in part.  The Supplemental Motion for Summary Judgment is granted.

## Background

This is a civil rights action pursuant to 42 U.S.C. § 1983 and Colorado state law arising from Plaintiff's incarceration at the Park County Jail (the "Jail") from March 1, 2003 to March 8, 2003. Plaintiff is a Mexican citizen who was arrested on March 1, 2003 and held in custody by the immigration authorities.[1] Pursuant to an agreement between the INS and Park County, Colorado, the Jail provides temporary housing to certain INS detainees in exchange for a payment. Plaintiff was held at the Jail and, while there, became severely ill, ultimately causing amputation of a leg and other residual damage to his health. Except as noted, the following facts are undisputed for the purposes of summary judgment.

Defendant Fred Wegener ("Sheriff") has been the Sheriff of Park County since January 1999. Defendant Monte Gore ("Captain Gore") was a Captain in the Sheriff's Department and the Jail Administrator, responsible for the overall daily operations of the Jail at the time Plaintiff was incarcerated. During Captain Gore's tenure, the number of INS inmates brought to the Jail increased, which helped to increase revenues for the Jail and the County. At this time, Park County had contracted with original Defendant James J. Bachman, M.D. to provide medical services at the Jail. However, he was primarily on call and acted in a supervisory role. Defendant Vicki Paulsen, RN, was the on-site medical contact at the Jail in March 2003, although some deputies also had some first responder

---

[1]At the time, the relevant governmental entity charged with enforcing immigration laws was the Immigration and Naturalization Service ("INS"). Although that agency has since been eliminated and immigration matters are now handled by various sections of the Department of Homeland Security, I will follow the convention used by the parties in their briefing and use the term "INS" to describe the responsible federal agency.

or other medical training.

Plaintiff, his brother, and his sister-in-law left their homes in Mexico around mid-February 2003 and traveled to the border, where they stayed for five or six days. After crossing the border, Plaintiff and others were put in a pickup truck and taken to Phoenix, Arizona, where they stayed for several more days. They then traveled by pickup to Colorado but were stopped by a patrol car. Plaintiff agreed to return voluntarily to Mexico and was processed by the INS. On March 1, 2003, Plaintiff, his brother, and his sister-in-law were transported to the Jail.

There were a number of written policies governing the operation of the Jail. Upon arrival, inmates were supposed to receive an inmate handbook in English and Spanish, intended to provide inmates with information about the Jail, its procedures, and how to get medical attention. Plaintiff denies receiving a handbook. According to the Jail's policies, new INS detainees were to receive a clean uniform, t-shirt, underwear, shoes, linens, and blankets upon arrival. Another policy provided that uniforms and underwear were to be exchanged on Tuesdays and all clothing and linens exchanged on Saturdays.

The Jail is divided into sections, or pods, which contain a common sleeping area on an upper level and a lower level with eating facilities and toilet and shower areas. According to the policies, "inmates are housed in cell or dormitory sleeping areas that provide at least 80 square feet of total living space per occupant." Pursuant to the Jail's cleaning policies, supplies were to be given to detainees and inmates in each pod three times daily after meals. Cleaning supplies were to include mops, buckets, rags, brooms, disinfectant, and window cleaner. During cold season, inmates and detainees were

3

supposed to clean with a bleach solution and mattresses issued to detainees were also supposed to be cleaned with bleach solution before being reissued. Trash was to be removed regularly. Deputies or inmate/detainee trustees were supposed to supervise cleaning to ensure that the areas were cleaned. Policies further provided that "[i]t is the policy of the Sheriff's Office to ensure that all inmates in the jail facility have the opportunity to shower daily. All showering units will be maintained at 105 Fahrenheit to prevent the danger of scalding."

Notwithstanding this and other policies, the Jail had intermittent problems with the showers, plumbing, and heating systems, such that showers were at times impossible to regulate (and were either scalding or freezing), pods were sometimes cold, and toilets sometimes backed up. A maintenance employee would be called to repair the systems, but problems apparently persisted.

According to policy, the Captain was responsible for conducting weekly and monthly sanitation and safety inspections, although the weekly inspections could be delegated to a deputy. Captain Gore testified that he delegated the weekly inspections to his deputies, that his own inspection did not always occur monthly, and that his sanitation inspection consisted of walking through the pods. Dr. Bachman was permitted to view the pods from a window but not to enter for his own inspections, which usually occurred every three or four months. The Sheriff walked through the Jail approximately once every two weeks.

The Jail also had a policy of providing all inmates and detainees with access to medical care. Medication was supposed to be delivered to pods three times a day by the nurse or deputies. Inmates could complete a written form to request medical attention and

4

give it to the deputies. When the nurse delivered medicine, inmates could try to communicate with her about medical issues. Deputies often noted medical issues and would forward them to the nurse. Pursuant to his agreement with the County, Bachman was supposed to develop medical protocols. However, none has been provided as evidence in this matter. A written "Communicable Diseases" policy existed, which emphasized screening and provided information about methods of transmission, common symptoms of communicable disease, and procedure, including isolation of a sick inmate and calling the Jail doctor. The policy also emphasized the importance of preventing the spread of such diseases among inmates. The informal policy of the Jail, however, was to give all medical information to the nurse, who then decided whether to inform the supervising doctor.

However, pursuant to the policies, the Jail was supposed to have an infection control program and an infection control report submitted quarterly to the medical director. No such program, committee, or reports were ever implemented. The policies also described certain responsibilities of the "health services administrator." It is unclear who had this role; Nurse Paulsen did not know that she was expected to fulfill these duties at the time.

The INS conducted an inspection of the Jail in September 2002. While most policies and procedures were rated as acceptable, the INS deemed the laundry policy as "deficient" because inmates were not given a daily change of clean underwear. The inspector(s) rated the inmates' access to medical care acceptable and noted "Excellent medical unit."

5

Pod D, which was used for housing male INS detainees, was approximately 740 square feet in the upper tier and 735 square feet in the lower tier. It had two toilets and two urinals and one large wastebasket on the lower level. The original architectural drawings for the Jail indicated eight or nine bunks in the pod; with double bunks, this would accommodate approximately 16-18 inmates. The dining area in Pod D also contained 18 seating places. At this capacity, the Pod would comply with the written requirement that inmates have 80 square feet of living space per occupant. However, at some point after the Jail began to house INS detainees, in 2001, more bunks were added to the pod. Eventually, and at the time of Plaintiff's detention, the pod contained 14 triple bunks, providing 42 beds. However, when these bunks were filled, additional detainees would be provided mattresses to put on the floor. The number of detainees in the facility varied per day, but averaged more than 18 detainees per day from January to March 2003 (26.1, 31.1, 20.3 for each respective month). Captain Gore had no policy limiting the number of detainees the Jail would accept from the INS. The Sheriff was aware that detainees slept on the floor of the pod when the bunks were filled and knew the overall number of inmates in the Jail. He did not have specific information about how many detainees were in Pod D on any given day. Nurse Paulsen testified that she expressed concern about the number of detainees housed in the pod to several deputies, but not to Captain Gore.

Plaintiff was processed at the Jail where, pursuant to policy, he completed a medical screening form in Spanish; Plaintiff did not identify any medical needs. Plaintiff was given a uniform and linens. Plaintiff testified in his deposition that, notwithstanding the policy, he was given dirty, smelly clothes and blankets. There is a dispute about how

6

many detainees were in the pod on March 1, 2003. Plaintiff contends that there were 41 before his group arrived, for a total of 48. Defendants argue that there were 41 total, including Plaintiff and the other newly arrived detainees. Plaintiff had to sleep on the floor because all of the bunks were full. On March 2, 2003, the pod held 48 detainees. On March 4, 2003, there were 50 detainees in the pod. On March 6, there were 61 detainees. On March 7, 2003, 50 detainees were transferred out of the Jail, leaving 11 detainees on the night of March 7, 2003 and the morning of March 8, 2003.

According to Plaintiff, the pod was dirty and many inmates were sick. Tissue and toilet paper containing mucous and saliva were strewn around the pod. The pod was cold and detainees plugged the air duct with blankets to stop the cold air. The showers and toilets were not functioning properly. The shower temperature was either scalding or freezing and the inmates sometimes could not shower. The toilets were frequently backed up. The deputies attempted to clear them but sometimes were unsuccessful because of the volume of waste. There is conflicting testimony about whether cleaning supplies were provided. According to the Jail records and deputy testimony, cleaning supplies were provided every day. However, Plaintiff testified that the pod was never cleaned and could not be properly cleaned because of the overcrowding and because detainees were not given chemicals. Several inmates were extremely sick, sweating, shaking, and vomiting; many others had coughs, runny noses, and other cold and flu symptoms. Later, inmates vomited on the floor and only had paper towels to clean with; there is evidence that the toilet seats had vomit on them. In addition, the Jail laundry facilities had broken down so that no clean laundry was available. On March 4, 2003, the detainees had to take off their

7

clothes so that they could be laundered. The detainees wrapped themselves in blankets until their clothes were returned to them.

The deputies were aware that several inmates were sick, so additional coolers with drinks and water were placed in Pod D on March 4, 2003. Captain Gore was informed by memo that several detainees "appear to be experiencing chest colds/flu or altitude sickness." Plaintiff became ill on March 4, 2003 and requested to see the nurse; however, Nurse Paulsen was not at the facility that day because she had had oral surgery. Although she returned to work on March 5, Plaintiff did not know when she went by and was not able to get her attention. Plaintiff finally saw Nurse Paulsen on March 6, 2003, after his brother brought it to a deputy's attention that Plaintiff had not been seen. Speaking through a detainee interpreter, he reported aches, headache, nausea, diarrhea, nasal congestion, and a sore throat. Nurse Paulsen's notes describe that he was tender over the stomach area, had a temperature of 100.2, and his respiration was at 24. However, Plaintiff testified that she did not examine him at all and only asked him where he was from. She gave him Ibuprofen, over the counter nasal congestion medicine, and Pepto-Bismol for his nausea. She told him he would feel better soon, that he had altitude sickness, and to inform medical if he did not improve. Four other detainees were seen by Nurse Paulsen the same day for medical issues. Nurse Paulsen did not notify Dr. Bachman of the sick detainees at that time or thereafter.

The next day, March 7, Plaintiff was not better and had a painful cough. He asked to see the nurse again. He again complained of headache, nausea, vomiting, body aches, diarrhea, and nasal congestion. His abdomen was tender and his respiratory rate was 24,

8

but his fever was down. Nurse Paulsen again gave him the same over the counter remedies. She did not contact Dr. Bachman. Medication was delivered to inmates three times on March 7. When Nurse Paulsen left the Jail for the weekend, she left instructions for the Jail staff to keep an eye on Plaintiff and informed them of the medications he could take.

Plaintiff got progressively more ill through the night of March 7 and morning of March 8. The inmate who had previously acted as interpreter for him had been transferred out of the pod. Deputy Don Frye entered Pod D at 1 a.m. and observed Plaintiff holding his stomach and looking sick. Deputy Frye communicated with Plaintiff with the help of another inmate and gestures. Deputy Frye gave Plaintiff more pain reliever and Pepto Bismol. At around 3 a.m., Plaintiff again complained to the deputy that he was very sick and was having trouble breathing. Plaintiff pointed to his back and throat to indicate his pain. Deputy Frye took Plaintiff to the infirmary and checked his vital signs, which showed a blood pressure of 143/78, respiration of 34, which indicated shallow breathing, and pulse of 62. He gave Plaintiff oxygen and asked the controller, Deputy William Fikejs, to call Nurse Paulsen at home. Deputy Fikejs called Nurse Paulsen and informed her that Plaintiff was having trouble breathing, that he was vomiting, and that he had nausea. Nurse Paulsen instructed the deputies to continue to monitor Plaintiff's condition and let her know if it worsened. According to Nurse Paulsen, Deputy Fikejs told her that Plaintiff felt better after taking oxygen, but Deputy Frye's notes indicated that Plaintiff said the oxygen did not help.

For the rest of the night, Deputy Frye observed that Plaintiff continued to appear to

9

be ill and in distress. He offered Plaintiff more oxygen at around 5:20 a.m., which Plaintiff declined. He asked Plaintiff to indicate his condition with a thumbs up for better, thumbs down for worse, and flat hand for the same; Plaintiff both times indicated he felt the same. Plaintiff pointed to his mid lower right section of his back, indicating pain. Deputy Frye gave Plaintiff more medication at 7 a.m.; Plaintiff again indicated with hand gestures that he felt the same and declined oxygen. At some point that night or morning, Plaintiff noticed blood in his urine.

Nurse Paulsen called at 6 a.m. to check on Plaintiff's condition. She was told he was resting and had used the restroom once in the last two hours. She arrived at the Jail around 7:45 or 8 a.m. Around 8:10 a.m., Plaintiff collapsed on the floor of the pod. Nurse Paulsen was called to examine him. She noted that he had acute pain on his right side over his right kidney, radiating to his right flank and down into the lower right abdomen. She had him moved to the lower tier of the pod and determined he needed to be taken to a medical facility, as Dr. Bachman was unavailable. She did not know what was wrong with him but believed it possible that he had a kidney stone and so sent a deputy to purchase cranberry juice. When Plaintiff attempted to drink the juice, he vomited into a trash can.

Nurse Paulsen was told by a corporal that she had to call the INS to get permission to transport Plaintiff to a medical facility. Nurse Paulsen was told by an INS official that they could not guarantee transport for another three hours, but that she could move Plaintiff if his condition worsened. She called the medical center to inform them that Plaintiff would be arriving; however, she did not prepare copies of her treatment records

10

to go with Plaintiff. She then left the Jail around 9 a.m. to return home, despite a Jail policy requiring her to stay on-site while awaiting transport. Paulsen called the Jail around 11 a.m. to check on Plaintiff's status. She learned at that time he had not yet been transferred and that he was vomiting more frequently. She then ordered that he be immediately taken to the medical center. Plaintiff had been continuing to vomit, was having breathing trouble, and vomited while in transit. One officer observed blood in Plaintiff's saliva but this was not communicated to Nurse Paulsen.

Upon arrival at the Summit Medical Center around 12:40 p.m., Plaintiff was treated by Timothy B. Keeling, D.O., who diagnosed Plaintiff with "1. Right middle lobe and right lower lobe pneumonia 2. Sepsis 3. Hypokalemia 4. Elevated, creatinine, abnormal chemistries." Because the Summit Medical Center had no inpatient facility to treat Plaintiff, Dr. Keeling ordered him transferred to Denver Health Medical Center. He was taken by ambulance around 3:28 p.m. and arrived at approximately 4:55 p.m. His condition was unstable when he arrived and he declined rapidly. He was in septic shock on arrival and had pneumonia in both lungs. He was in respiratory failure and had rapidly progressing multi-organ dysfunction. It was determined that his pneumonia was caused by streptococcus Group A bacteria, which is particularly aggressive and toxic. Plaintiff's lower legs were so seriously compromised that one had to be amputated and the other was barely saved. According to the treating physician, once septic shock develops, a patient must receive treatment within a four hour window or survival is unlikely.

The remaining detainees were examined and treated medically on March 10, 2003. Several were prescribed antibiotics because Dr. Bachman believed they had bacterial

11

infections. A memo was issued on March 9, 2003, instructing that all pods be cleaned with a 10% bleach solution, with particular attention to any accumulated mold. Another memo followed the next with instructions to clean all units daily with bleach solution and to attempt to exchange linens daily, as well as cleaning procedures for mattresses.

In the Second Amended Complaint, which now governs this dispute, Plaintiff alleges the following claims: (1) violation of Plaintiff's constitutional right to sanitary conditions of confinement and adequate medical care against the Board, the Sheriff, and Captain Gore; (2) violation of Plaintiff's constitutional right to sanitary conditions of confinement and adequate medical care against Nurse Paulsen[2]; and (3) negligence against Nurse Paulsen. In particular, Plaintiff alleges the defendants failed to enact policies and procedures to adequately staff and train personnel to diagnose illness, respond to medical emergencies, treat inmates, and to prevent overcrowding and development of unsanitary conditions at the Jail.

## Standard of Review

Summary judgment should be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). A genuine issue of material fact exists when "the evidence, construed in the light most favorable to the non-moving party, is such that a reasonable jury could return a verdict for the non-moving party." *Anderson v. Liberty*

---

[2]Dr. Bachman was originally named as a defendant in this action but the claims against him have been dismissed.

12

*Lobby, Inc.*, 477 U.S. 242, 248, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

Discussion

1.    Liability of the Board of County Commissioners

Defendant Board of County Commissioners of Park County argues that it cannot be liable for any alleged violations occurring from Plaintiff's confinement because it is not responsible for the operations of the Jail, it took no action that resulted in Plaintiff's injuries, and because no policy or practice of the Board violated Plaintiff's constitutional rights.

A municipality or other governmental entity may be subjected to liability under § 1983 where the action alleged to be unconstitutional executes or implements a governmental policy or custom. *Monell v. New York Dept. of Social Services*, 436 U.S. 658, 690-91 (1978).

I agree that the Board is not a proper defendant in this action, but that the County is liable for claims against its employees in their official capacities. Under the Colorado Constitution, county commissioners and Sheriffs are separate governmental officers. Colo. Const. art. XIV. Pursuant to statute, sheriffs have the authority and responsibility to oversee county jails. C.R.S. § 30-10-511. Colorado courts have determined that a sheriff, not the board of commissioners, is the legal entity responsible for tortious behavior by a deputy sheriff. *Tunget v. Board of County Comm'rs of Delta County*, 992 P.2d 650, 651-52 (Colo. App. 1999). The parties do not appear to dispute that an action against the Sheriff in his official capacity is essentially an action against the entity that employs him—i.e., Park County.    *Pietrowski v. Town of Dibble*, 134 F.3d 1006, 1009 (10th Cir. 1998) (citing

13

*Kentucky v. Graham*, 473 U.S. 159, 165-66 (1985)). Moreover, Defendants concede that if Plaintiff is successful on his official capacity claims, the county's funds will be available to satisfy a judgment. The parties also do not appear to dispute that the Sheriff is the final policymaker for matters concerning the operations of the Jail. *See, e.g., Cortese v. Black*, 838 F.Supp. 485, 496 (D.Colo. 1993).

Plaintiff argues that the Board does have responsibility for the operations of the Jail and that its official policies and practices directly caused Plaintiff's injuries. First, Plaintiff contends that because the Board has the authority to adopt an annual budget for the Jail and power to use the county jail for the incarceration of offenders, it is also responsible for the operations of the Jail. The case cited by Plaintiff in this regard, *Robertson v. Board of County Comm'rs of County of Morgan*, 985 F. Supp. 980, 985 (D. Colo. 1997) is an employment case addressing standing issues and I do not find it persuasive. Plaintiff also cites *Winton v. Board of Commr's of Tulsa County, Okla.*, 88 F. Supp. 2d 1247 (N.D. Okla 2000). However, since *Winton* did not involve an analysis of the respective roles and responsibilities of the sheriff and board, it has no bearing on this issue.

Plaintiff also argues that the Board is a responsible entity because, pursuant to statute, "[i]t is the duty of the board of county commissioners to make personal examination of the jail of its county, its sufficiency, and the management thereof during each session of the board and to correct all irregularities and improprieties therein found. C.R.S. § 17-26-126. However, a Colorado court has held that this provision does not mean that a board exercises managerial control over either the sheriff, the detention center, or its staff, and does not impose a legal duty to ensure the safety of an inmate. *See Terry v. Sullivan*,

14

58 P.3d 1098, 1102 (Colo. App. 2002). Because Colorado law does not hold the Board responsible for the acts of the Sheriff in connection with the management of the Jail, I decline to find that it had independent duties or was the responsible policymaker for purposes of section 1983. *See Frazier v. Jordan*, Case No. 06-1333, 2007 WL 60883 at *6 (10th Cir. Jan. 10, 2007).

Finally, Plaintiff argues that the Board "encouraged and approved the practice of overcrowding," which created the unsanitary conditions that led to Plaintiff's injuries, by approving "revenue-producing budgets creating greater and greater profits for the county" by increasing the number of inmates and detainees housed in the Jail through contracts like that with the INS. Aside from approving budgets, all the alleged actions upon which Plaintiff bases his claims are those taken by the Sheriff and Captain Gore. Plaintiff has provided no evidence to show that the Board had the authority to or actually did make any decisions or implement a policy or custom that caused injury to Plaintiff. Simply entering into a contract with the INS is not sufficient to establish a "policy," where the Sheriff and his staff, not the Board, had the authority to determine how many inmates the Jail would house and how they would be treated. Plaintiff offers newspaper articles showing that the Board was aware of profits generated by the Jail and generally approved of Captain Gore's management of the facility. This is far too attenuated to show that the Board took any action that caused Plaintiff's injuries.

Since Plaintiff's authorities do not demonstrate that the Board, rather than the Sheriff, is the responsible policymaker for the conditions and operation of the Jail by law and in practice, summary judgment in favor of the Board is appropriate on all counts. As

15

discussed, however, this does not mean that Park County will avoid liability if Plaintiff

proves that his injuries resulted from an official policy or practice of the Sheriff.

2.    Constitutional Violation for Inadequate Medical Care

Plaintiff's First Claim for relief against the Sheriff and Captain Gore and his Second

Claim against Nurse Paulsen are based upon alleged inadequate medical care. The Due

Process clause of the Fourteenth Amendment governs a pretrial detainee's claim of

unconstitutional conditions of confinement; however, the Eighth Amendment standard

provides the analytic framework for such claims. *Craig v. Eberly*, 164 F.3d 490, 495 (10th

Cir. 1998). The Eighth Amendment requires jail officials "to provide humane conditions of

confinement by ensuring inmates receive the basic necessities of adequate food, clothing,

shelter, and medical care and by taking reasonable measures to guarantee the inmate's

safety." *Barney v. Pulsipher*, 153 F.3d 1299, 1310 (10th Cir. 1998).

It is well established that prison officials violate the Eighth Amendment if their

"deliberate indifference to serious medical needs of prisoners constitutes the unnecessary

and wanton infliction of pain." *Estelle v. Gamble*, 429 U.S. 97, 104 (1976) (internal

quotation marks omitted). However, a claim based on "an inadvertent failure to provide

adequate medical care" or alleging "that a physician has been negligent in diagnosing or

treating a medical condition" does not state a valid claim of medical mistreatment under

the Eighth Amendment. *Kikumura v. Osagie*, 461 F.3d 1269, 1291 (10th Cir. 2006)

(citations omitted). "Rather, 'a prisoner must allege acts or omissions sufficiently harmful

to evidence deliberate indifference to serious medical needs.'" *Self v. Crum*, 439 F.3d

1227, 1230 (10th Cir. 2006) (quoting *Estelle*, 429 U.S. at 106).

16

To demonstrate an Eighth Amendment violation, an inmate must satisfy both objective and subjective elements. The objective component is met if the deprivation is "sufficiently serious," i.e., one that "has been diagnosed by a physician as mandating treatment or . . . is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Oxendine v. Kaplan*, 241 F.3d 1272, 1276 (10th Cir. 2001) (quoting *Hunt v. Uphoff*, 199 F.3d 1220, 1224 (10th Cir. 1999)). Delay in providing medical care can also support an Eighth Amendment claim, if the plaintiff can show that the delay resulted in substantial harm. *Id.* at 1276. That substantial harm can be the ultimate physical injury caused by the prisoner's illness or condition or an intermediate injury, such as the pain experienced while waiting for treatment. *Kikumura*, 461 F.3d at 1292.

The subjective component of the deliberate indifference test is met if the defendant "knows of and disregards an excessive risk to inmate health or safety." *Sealock v. Colorado*, 218 F.3d 1205, 1209 (10th Cir. 2000). A prison medical professional who "knows that his role in a particular medical emergency is solely to serve as a gatekeeper for other medical personnel capable of treating the condition" may be held liable under the deliberate indifference standard if that person delays or refuses to fulfill that gatekeeper role. *Id.* at 1211. "Deliberate indifference" does not require a showing of express intent to harm, rather, it is enough that the official acted or failed to act despite his or her knowledge of a substantial risk of serious harm. *Mata v. Saiz*, 427 F.3d 745, 752 (10th Cir. 2005) (citations omitted).

I first examine whether there is a genuine issue of material fact for trial on the alleged predicate constitutional violation, specifically, whether any of the employees of the

Sheriff were deliberately indifferent to Plaintiff's serious medical needs. The parties do not appear to dispute that Plaintiff's evidence establishes that Plaintiff's medical need was sufficiently serious,[3] the objective component of the claim. Similarly, there is no dispute that the delay in providing Plaintiff medical treatment caused him substantial harm. The singular issue, therefore, is the subjective component of each defendant's omission – i.e., did he or she know of a substantial risk to Plaintiff's health and thereafter acted or failed to act despite that knowledge.

A.    Nurse Paulsen

Nurse Paulsen argues that Plaintiff cannot establish the subjective component of the deliberate indifference test. She argues that she merely exercised her "considered medical judgment" in assessing Plaintiff's medical condition, similar to the defendant in *Self*, and appropriately decided when additional treatment was needed. In *Self*, the Tenth Circuit again emphasized that mere negligent misdiagnosis of non-specific symptoms, which were appropriately treated given the physician's understanding of the underlying condition, is not enough to permit an inference that the doctor consciously disregarded an inmate's medical emergency.[4] 439 F.3d at 1232-33 ("where a doctor orders treatment

---

[3]*Mata*, supra, establishes that the objective component of the test can be determined by reference to the ultimate harm to the prisoner, as well as the prisoner's symptoms at the time of the prison employee's actions. 427 F.3d at 753-54.

[4]*Self* also sets forth typical fact situations demonstrating "obviousness in the circumstances of a missed diagnosis or delayed referral," including "(1) a medical professional recognizes an inability to treat the patient due to the seriousness of the condition and his corresponding lack of expertise but nevertheless declines or unnecessarily delays referral, e.g., a family doctor knows that the patient needs delicate hand surgery requiring a specialist but instead of issuing the referral performs the operation himself; (2) a medical professional fails to treat a medical condition so

18

consistent with the symptoms presented and then continues to monitor the patient's condition, an inference of deliberate indifference is unwarranted under our case law").

Initially and through March 7, the evidence is undisputed that Plaintiff presented with symptoms consistent with a variety of conditions, including viral illness or altitude sickness, and that Nurse Paulsen ordered treatment consistent with those conditions. Even though Plaintiff presents some evidence indicating that his strep throat or pneumonia could have been diagnosed at that time, this does not suffice to establish that Nurse Paulsen knew of or consciously disregarded a substantial risk that he had a serious ailment. *See Self,* 439 F.3d at 1234 (the mere possibility that plaintiff's symptoms could also point to other conditions is not sufficient to create an inference of deliberate indifference). Plaintiff also argues that had Nurse Paulsen referred Plaintiff to a physician or other treating medical professional, rather than diagnosing and treating him herself, his strep throat could have been caught sooner and not developed into the serious pneumonia and sepsis. That may be, but Plaintiff's evidence in this regard shows at most negligence, not deliberate indifference.

The events of March 8, however, present a worsening scenario. As summarized above, Plaintiff's symptoms worsened considerably and included difficulty in breathing. Vital signs were troublesome and nausea with vomiting continued, despite being provided

---

obvious that even a layman would recognize the condition, e.g., a gangrenous hand or a serious laceration; and (3) a medical professional completely denies care although presented with recognizable symptoms which potentially create a medical emergency, e.g., a patient complains of chest pains and the prison official, knowing that medical protocol requires referral or minimal diagnostic testing to confirm the symptoms, sends the inmate back to his cell." 439 F.3d at 1242 (punctuation and citations omitted).

pain reliever and Pepto Bismol. Plaintiff's condition was apparently sufficiently serious that a lay person, Deputy Frye, felt it necessary to obtain Nurse Paulsen's advice. Nurse Paulsen was contacted at approximately 3 a.m. but took no action other than to instruct that she should be notified if his condition worsened.[5] In the morning, she did call but did not go to the Jail until approximately 8:00, shortly before Plaintiff collapsed at 8:10 a.m. After examination, she determined he should be taken to a medical facility. Even though she was apparently advised that transport may be delayed for several hours, she returned home in violation of the policy requiring her to remain on site pending transport. When checking on his status around 11:00 a.m., she learned he was still present and the symptoms had worsened. She ordered immediate transport to the medical center which promptly diagnosed the several problems and transferred him to Denver for treatment.

Under these circumstances, the issue is not whether Nurse Paulsen knew that Plaintiff had pneumonia and sepsis; the question is whether she failed her duties as a gatekeeper to capable medical help with deliberate indifference. Although it is a close issue, I conclude that, construing the disputed and undisputed facts in the light most favorable to Plaintiff, a reasonable jury could find that Nurse Paulsen was deliberately indifferent as a gatekeeper to the Plaintiff's medical needs by March 8, 2003. *See Kikumura*, 461 F.3d at 1295 (even if initial diagnosis was merely negligent, allegation that medical provider delayed treatment even after realizing seriousness of prisoner's condition could support a claim of deliberate indifference); *Mata*, 427 at 755-56 (nurse who did not

---

[5]There is also a genuine issue of material fact as to whether Nurse Paulsen was informed that Plaintiff improved after being administered oxygen.

examine inmate suffering from severe chest pains and told inmate that there was nothing she could do was deliberately indifferent to inmate's medical needs).

Defendant Paulsen asserts the defense of qualified immunity to Plaintiff's claim. "In an action under section 1983, individual defendants are entitled to qualified immunity unless it is demonstrated that their alleged conduct violated clearly established constitutional rights of which a reasonable person in their positions would have known." *Murrell v. Sch. Dist. No. 1, Denver, Colo.*, 186 F.3d 1238, 1251 (10th Cir. 1999). Once a defendant has raised qualified immunity as an affirmative defense, the plaintiff bears the heavy two-part burden of demonstrating that (1) the defendant violated a constitutional right and (2) the constitutional right was clearly established at the time of the alleged conduct. *Reynolds v. Powell*, 370 F.3d 1028, 1030 (10th Cir. 2004).

As discussed above, I conclude that there are facts from which a reasonable jury could conclude that Nurse Paulsen violated Plaintiff's constitutional right to adequate medical care. In addition, it appears that the right was clearly established in March 2003. The most pertinent case concerning potential liability of a gatekeeper is *Sealock*, which was decided in 2000. In that decision, the Tenth Circuit made clear that deliberate indifference may occur when "prison officials prevent an inmate from receiving treatment or deny him access to medical personnel *capable of evaluating the need for treatment*," even when the person denying or delaying access to care is a medical professional. 218 F.3d at 1211 (emphasis added). In addition, the *Oxendine* case, decided in 2001, clearly establishes that where a medical provider fails to give an inmate access to an outside medical resource, despite the obvious failure of the provider's treatment and resulting

21

serious medical condition of the patient, deliberate indifference and liability may be found. 241 F.3d at 1278-79 (prison doctor's delay in allowing plaintiff to see outside specialist for severed finger could be deliberately indifferent in light of obvious signs of gangrene and necrosis and performance of specialized surgery beyond prison doctor's skill and experience). Under these authorities, Plaintiff's right to timely access to a medical provider who could diagnose and treat his serious medical condition was clearly established.

Accordingly, Defendant Paulsen's motion for summary judgment on the second claim for relief should be denied.

B.    Sheriff and Captain Gore - individual capacity

Sheriff and Captain Gore move for summary judgment on this claim on the grounds that Plaintiff's evidence does not demonstrate that they were personally involved in any decisions regarding his medical treatment. In addition, to the extent that they received information about Plaintiff's condition, they were entitled to rely on Nurse Paulsen's medical assessments as to how to proceed (citing, inter alia, McCracken v. Jones, 562 F.2d 22 (10th Cir. 1977)). I agree. Plaintiff does not identify evidence showing that either of these defendants knew of Plaintiff's symptoms or prevented his access to medical care despite this knowledge. Moreover, although Plaintiff disputes whether Defendants would be entitled to rely on the opinion of a nurse, rather than a physician, Plaintiff has provided no authority that would indicate such reliance demonstrates deliberate indifference in these circumstances. Accordingly, no individual liability can attach to these defendants

22

on this claim.[6]

    C.    <u>Official Capacity</u>

Plaintiff also asserts municipal liability claims by asserting claims against the defendants in their official capacities. The County would not be liable under section 1983 solely because its employee inflicted injury. *Graves v. Thomas*, 450 F.3d 1215, 1218 (10th Cir. 2006) (citing *Monell*). Rather, municipal liability requires (1) the existence of a municipal policy or custom; and (2) a direct causal link between the policy or custom and the injury alleged. *Id.* (citing *City of Canton, Ohio v. Harris,* 489 U.S. 378, 385 (1989)). "When the claim is a failure to act, the plaintiff must demonstrate the municipality's inaction was the result of 'deliberate indifference' to the rights of its inhabitants." *Id.* (punctuation omitted). Under Tenth Circuit law, the deliberate indifference standard may be satisfied "when the municipality has actual or constructive notice that its action or failure is substantially certain to result in a constitutional violation, and it consciously and deliberately chooses to disregard the risk of harm." *Barney v. Pulsipher*, 143 F.3d 1299, 1307 (10th Cir. 1999). The question, then, is whether Nurse Paulsen's omissions were pursuant to or the result of an official government policy or custom, including a policy or custom of failing to train or supervise on-site personnel amounting to deliberate indifference.

---

[6]Although Plaintiff generally asserts that these defendants could be individually liable on theories of failure to supervise or failure to train, Plaintiff does not provide any specific analysis in this regard. As discussed in connection with the municipal liability claim, I discern no evidence indicating any link between Nurse Paulsen's decision not to immediately transport Plaintiff for medical care and any alleged failure to train or supervise amounting to deliberate indifference.

Defendants argue that no liability can attach because there were numerous policies in place regarding medical care for detainees, including policies requiring screening, on- and off-site treatment, delivery of medication, transfer of information, and isolation of ill inmates. In addition, Defendants argue that Plaintiff cannot show a causal connection between any policy or custom and his injury. In response, Plaintiff argues that the failure to ensure that enacted policies were understood and implemented by staff is sufficient to impose liability.

I agree with Defendants. There is nothing in the record to indicate that Nurse Paulsen's delay in permitting Plaintiff to access outside medical treatment was the result of any official policy or custom, but rather resulted from the exercise of her discretion. In addition, Plaintiff has offered no evidence from which a reasonable jury could conclude that the official policymakers had actual or constructive notice that more training or closer supervision was needed or that the existing medical policies were insufficient. There were policies in place for the detection, isolation, and treatment of disease.[7] There is no evidence of previous serious outbreaks of serious illness or of a patient being denied medical care for a serious condition, or of reports from inspectors, that would have given notice that these policies or training were inadequate. Moreover, Nurse Paulsen was a trained medical professional. Plaintiff has offered no evidence to show that the County would not be entitled to rely on her training or judgment in these circumstances or had notice that she might not competently perform her nursing or gatekeeper duties. The facts

---

[7]Even if these policies were not followed, this is not sufficient to give rise to municipal liability in the absence of notice.

24

presented here, even construed in the light most favorable to Plaintiff, simply do not demonstrate the requisite level of culpability to establish municipal liability for failing to train personnel in policies concerning detection and treatment of illnesses. *Meade v. Grubbs*, 841 F.2d 1512, 1528 (10th Cir. 1988) (a supervisor or municipality may be held liable where there is essentially a complete failure to train, or training that is so reckless or grossly negligent that future misconduct is almost inevitable).

3.    Constitutional Violation for Inhumane Conditions of Confinement

Plaintiff asserts claims against Defendants based on inhumane conditions of confinement. Where conditions of confinement are egregious and inhumane, they may constitute "cruel and unusual punishment" in violation of the Eighth Amendment. The elements to be satisfied for such a claim are essentially the same as those for a claim of failure to provide adequate medical treatment: an inmate must establish that (1) the condition complained of is "sufficiently serious" to implicate constitutional protection; and (2) prison officials acted with "deliberate indifference." *Farmer v. Brennan*, 511 U.S. 825, 834 (1994).

The defendants appear to concede for the purposes of summary judgment that Plaintiff's evidence, if credited by a reasonable jury, would be sufficient to establish that the conditions of the detention center were serious enuogh to warrant constitutional protection. *See DeSpain v. Uphoff*, 264 F.3d 965, 973-74 (10th Cir. 2001) (conditions are sufficiently serious if they pose a substantial risk of serious harm to inmate health or safety; exposure to human waste, even for a short duration, carries "particular weight" in the conditions calculus because of the attendant health concerns). However, they contend

25

they are entitled to summary judgment because of a lack of personal participation in the alleged violation or because Plaintiff cannot demonstrate that they were deliberately indifferent to these conditions.

Deliberate indifference requires a showing that the official "knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer,* 511 U.S. at 837. The test requires a mental culpability on par with criminal recklessness. *Id.* at 836. In some cases, it may be possible to infer that a prison official knew of a substantial risk from the very fact that the risk was obvious. *Id.* at 842. However, if an official is aware of the potential for harm but takes reasonable efforts to avoid or alleviate that harm, there is no liability. *Id.* at 844.

A.     Nurse Paulsen

It is unclear whether Plaintiff still asserts a conditions-of-confinement claim against Nurse Paulsen. In Nurse Paulsen's motion for summary judgment, she posits that the only section 1983 claim against her was for inadequate medical care. Plaintiff's complaint does not appear to so limit his section 1983 claim but his response to Nurse Paulsen's motion did not challenge this characterization of his claims. I interpret that silence as a waiver of any such claim that may have been included in his complaint. I would also observe that Plaintiff has made no factual showing that Nurse Paulsen had any authority to make any changes regarding the Jail conditions. Accordingly, she would not by herself be responsible to correct or change the alleged overcrowding and unhealthy conditions of confinement. She cannot, therefore, be liable for the confinement conditions, individually

26

or in an official capacity.

   B.    Sheriff - individual capacity

   It is undisputed that the Sheriff, during the relevant time period, had delegated

responsibility for day-to-day operations of the Jail to Captain Gore. Plaintiff's evidence

shows that the Sheriff walked through the Jail approximately once every two weeks and

that he had information about the total number of inmates housed in the Jail on a given

day, although this information was not broken down by pod or unit. He also appears to

have been generally aware of overcrowding, in that he knew that inmates sometimes slept

on the floor when bunks were filled. Plaintiff argues that the Sheriff should be held liable

in his individual capacity for failure to supervise or train Captain Gore and other personnel,

thereby allowing the overcrowding, filth, and disease to develop.

   To establish supervisory liability, a plaintiff must establish a "deliberate, intentional

act" by a supervisor such that there is a "sufficient causal connection" between the

supervisor and the constitutional violation. *Serna v. Colo. Dep't of Corr.*, 455 F.3d 1146,

1151 (10th Cir. 2006). Again, mere negligence is not sufficient to establish liability. *Id.*

Rather, a plaintiff must show active participation or acquiescence through personal

participation, exercise of control or direction, failure to supervise, or tacit authorization of

the offending acts. *Id.* at 1152-53. Where, as here, the sheriff is responsible for proper

management of a jail, the sheriff maybe accountable if he "knew or should have known of

the misconduct, and yet failed to prevent future harm." *Meade,* 841 F.2d at 1528 (citations

omitted).

   A reasonable jury could infer from the disputed and undisputed facts that the Sheriff

27

had notice of and acquiesced to the overcrowding and potential hazards to inmate health in the D-pod. Although the Jail may have had numerous policies in effect designed to address sanitation and disease, it appears that the Sheriff had at least constructive knowledge that the pods were sometimes overcrowded. As discussed below, in light of the obviousness that contagion and unsanitary conditions could result, it is possible for a reasonable jury to conclude that the Sheriff knew of and tacitly approved of the creation of conditions that posed a risk to inmate health. Accordingly, I conclude that the Sheriff is not entitled to judgment as a matter of law on Plaintiff's claim of supervisory liability for the alleged unsanitary conditions. Moreover, as discussed further below, because the law in this regard was well-established, he is not entitled to qualified immunity.

C.     Captain Gore - individual capacity

Defendants argue that summary judgment should enter in Captain Gore's favor as well because Captain Gore did not personally participate in any violation of Plaintiff's constitutional rights and there is no affirmative link between any of his actions in a supervisory capacity as Jail Administrator and Plaintiff's alleged harms. They further argue that, even if Plaintiff could establish a violation of his constitutional rights, Captain Gore is entitled to qualified immunity because no constitutional right was clearly established at the time.

Since Captain Gore was responsible for the day-to-day operations of the Jail and was the final policy maker with respect to how many inmates would be housed in D-Pod, the argument that he had no personal participation in the creation or mitigation of the conditions of Plaintiff's confinement must fail. There is no dispute that Captain Gore knew

28

how many detainees were in the D-Pod on a given day and there is disputed evidence

that, as a matter of official or unofficial policy, the Jail would accept as many detainees as

the INS wanted to send. Moreover, it is undisputed that Captain Gore had supervisory

responsibility over enforcement of Jail policies concerning sanitation and cleaning. This

could be sufficient to impute liability if he had knowledge of the failure of those policies.

See DeSpain, 264 F.3d at 976-77 (associate warden in charge of prison unit that was

flooded for several days could be found to have been deliberately indifferent to health

risks).

I conclude that there are numerous disputed and undisputed facts that preclude

entry of summary judgment in Captain Gore's favor on this issue. First, a reasonable jury

could conclude that the pod was designed for eighteen inmates but that it often held more

than double that number. It would also be reasonable to infer that the health risks of

overcrowding is fairly obvious, particularly with respect to INS detainees, some of whom,

like Plaintiff, may have traveled far under arduous circumstances. Moreover, there is

evidence from which a jury could conclude that Captain Gore knew about recurring

problems with the toilets and showers, which were never fully resolved. See Farmer, 511

U.S. at 842-43 (where risk was longstanding, pervasive, well documented, or expressly

noted by prison officials in the past, it may be permissible for trier of fact to conclude that

defendant official had actual knowledge of the risk). For fifty or sixty inmates to share two

toilets that had a tendency to get backed up and overflow, while depriving inmates of the

ability to shower except in freezing cold water, even for a few days, creates a fairly obvious

risk of a deprivation of a minimum humane standard of health and sanitation. There is also

29

evidence that Nurse Paulsen expressed concern about the overcrowding; although she did not inform Captain Gore directly, a jury could infer that he knew of the risk for the same reasons that she did. Moreover, there is evidence that despite a policy concerning segregation of inmates with symptoms of infectious diseases, that policy could not be implemented when the Jail was filled beyond capacity.[8] In addition, Captain Gore was informed by memo that several detainees in the D-Pod were ill, which, in light of the number of detainees in the facility, presents an obvious risk of the spread of infection. Finally, it appears that Captain Gore's sanitation inspections were cursory and the Jail doctor was not allowed to enter the pod for his inspections, which could support an inference of deliberate indifference.

Moreover, Captain Gore is not entitled to qualified immunity in this regard. As discussed above, I conclude that Plaintiff can demonstrate that Captain Gore violated his Eighth Amendment right to humane conditions of confinement. I look to whether the right was clearly established at the time. In order for the law to be considered clearly established, the Tenth Circuit has explained that "there must be a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts must have found the law to be as the plaintiff maintains." *Medina v. City and County of Denver*, 960 F.2d 1493, 1498 (10th Cir. 1992). In 2003, when Plaintiff was detained at the Jail, several cases had clearly established an inmate's right to humane conditions of

---

[8]Similarly, the existence of a policy mandating the creation of an infectious disease committee and regular reports, while never implemented, is further evidence that Captain Gore knew about the need to prevent the spread of infectious disease in the Jail but failed to follow up.

30

confinement, including to basic sanitation.  The decision in *Farmer v. Brennan* clearly

established that a prison official's deliberate indifference to a substantial risk of serious

harm to inmate health or safety could give rise to liability.  The *DeSpain* case also

established the particular hazards of allowing inmates to be exposed to human waste,

even for a short time.  Similarly, cases such as *Wilson v. Seiter*, 501 U.S. 294 (1991) and

*Craig v. Eberly*, 164 F.3d 490 (10th Cir. 1998) made clear that several conditions of

confinement may combine to establish an Eighth Amendment violation "when they have

a mutually enforcing effect that produces the deprivation of a single, identifiable human

need such as food, warmth, or exercise." *Wilson,* 501 U.S. at 304.  Here, a reasonable jury

could conclude that the overcrowding, failure to segregate ill inmates, hot and cold water

problems, toilet backups, and inability to clean the pod combined to create a serious

deprivation of hygiene and sanitation.  Accordingly, I conclude that Captain Gore is not

entitled to qualified immunity.

      D.    <u>Official Capacity</u>

Defendants Wegener and Gore also argue that no municipal liability can attach

because adequate policies were in place to ensure appropriate conditions, including

policies relating to bedding and laundry, medical screening procedures, and adequate

responses to complaints about cold and plumbing problems, and policies regarding

cleaning of the pods.  Moreover, Defendants argue that there was no custom, policy, or

practice of the Jail to house more than a constitutional number of detainees in D-Pod.  I

disagree.

In order to establish municipal, or county, liability, a plaintiff must show "that the

31

unconstitutional actions of an employee were representative of an official policy or custom of the municipal institution, or were carried out by an official with final policy making authority with respect to the challenged action." *Camfield v. City of Oklahoma City,* 248 F.3d 1214, 1229 (10th Cir. 2001). There is no dispute that the Sheriff has final policy making authority over the conditions at the Jail and that he delegated that authority to Captain Gore. There is evidence from which a reasonable jury could infer that the overcrowding was the result of an official or unofficial policy. Plaintiff has presented testimony from several Jail employees indicating that overcrowding was not limited to the time of Plaintiff's detention and that Captain Gore instructed deputies not to turn away any INS detainees. There are monthly statistics that could show that the Pod often held more than an optimal number of inmates. This inference could also supported by evidence that the Jail had a practice of putting inmates on the floor when bunks were filled, which again indicates a policy of permitting overcrowding. Plaintiff also has presented evidence that the overcrowding prevented the implementation of otherwise adequate policies relating to cleaning and preventing the spread of infectious disease.

Defendants also argue that Plaintiff cannot demonstrate a connection between the allegedly overcrowded/unsanitary conditions and his injuries. This is an issue of material fact. Plaintiff has presented evidence that he was not ill before his arrival at the Jail and a jury could reasonably infer that he contracted his illness as a result of exposure to other inmates and the inability to maintain a hygienic environment because of the overcrowding. Accordingly, summary judgment on Plaintiff's municipal liability claim for failure to provide humane conditions of confinement is not appropriate.

32

4.     Constitutional Violation For Failure to Provide Translator at Jail

Although not clearly identified as a separate violation in his complaint, Plaintiff also apparently asserts a separate claim of violation of due process for the failure of the Jail to provide a translator.  There is no indication that the failure to provide Plaintiff with prompt medical treatment was due to any difficulty in communication.  The only time that Plaintiff did not have someone available to translate for him was on the morning that Nurse Paulsen determined he needed to be taken to the medical center, and so having a translator would have made little difference.  Plaintiff appears to argue in the alternative that he was given medical treatment without his consent.  However, the only treatment administered to Plaintiff without information from a translator was cranberry juice; Plaintiff has not identified any harm resulting from this.  Even if Plaintiff could establish a harm, he has not identified any Tenth Circuit or Supreme Court case establishing a constitutional right to a translator such that the Defendants' claim of qualified immunity could be overcome.  Accordingly, summary judgment is appropriate on this claim.

5.     Constitutional Violation - Equal Protection

Plaintiff also vaguely asserts a claim for violation of equal protection under the laws, arguing that his entitlement to safe and humane conditions is a fundamental right. Defendants contend that this claim fails because, *inter alia*, Plaintiff must demonstrate that a challenged policy or act has a discriminatory effect and was motivated by a discriminatory intent and that Plaintiff was treated differently from others similarly situated to him. *See United States v. Armstrong,* 517 U.S. 456, 466 (1996); *Tonkovich v. Kansas Board of Regents*, 159 F.3d 504, 532 (10th Cir. 1998).  Plaintiff appears to argue in

33

response that since his claim concerns a fundamental right, he need not identify a similarly situated group. Plaintiff misapprehends the applicable law.

"The threshold requirement of an Equal Protection claim is a showing that the government discriminated among groups." *Kinnell v. Graves*, 265 F.3d 1125, 1128 (10th Cir. 2001). Where the classification at issue does not affect a suspect class or fundamental right, it need only bear a "rational relationship" to a legitimate end. *Id.* Where a suspect class or fundamental right is implicated, a government classification is subjected to strict scrutiny review. *Save Palisade FruitLands v. Todd*, 279 F.3d 1204, 1210 (10th Cir. 2002). In his response brief, Plaintiff does not identify any classification that he contends discriminated among different groups at the Jail. In addition, he presents absolutely no evidence pertaining to the medical treatment or conditions of confinement of any other group under the control of this particular government authority. Accordingly this claim must fail.

Accordingly, it is ordered:

1.     The Motion for Summary Judgment from Defendants Park County Board of County Commissioners, Fred Wegener and Monte Gore (doc no 117) is granted in part. The claims asserted against the Board of County Commissioners are dismissed. The claims based on inadequate medical treatment against Fred Wegener and Monte Gore in their individual and official capacities are dismissed.

2.     The Supplemental Motion for Summary Judgment (doc no 195) is granted. Plaintiff's claims based on the failure to provide a translator and for violation of his equal protection rights are dismissed.

3.    Vicki Paulsen's Motion for Summary Judgment (doc no 121) is denied.

4.    The following claims of Plaintiff remain pending:

    a.    First Claim for Relief against Defendants Wegener and Gore in their individual and official capacities for inhumane conditions of confinement;

    b.    Second Claim for Relief against Defendant Paulsen individually for constitutionally inadequate medical care; and

    c.    Third Claim for Relief against Defendant Paulsen for negligence.

DATED at Denver, Colorado, on August 17, 2007.

BY THE COURT:

s/ Walker D. Miller
United States District Judge

35